UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
LUIS ERNESTO FLORES,                              Chapter 7
            DEBTOR.                               Case No. 13-16079-WCH
_____

SEGA AUTO SALES, INC.,
            PLAINTIFF,
                                                 Adversary Proceeding
v.                                               No. 13-01441

LUIS ERNESTO FLORES,
            DEFENDANT.
_____

## MEMORANDUM OF DECISION

## I. <u>INTRODUCTION</u>

The matter before the Court is the "Plaintiff's Rule 59 Motion to Alter or Amend Judgment" (the "Motion for Reconsideration") filed by the plaintiff Sega Auto Sales, Inc. (the "Plaintiff") and the "Defendant's Opposition to Plaintiff's Rule 59 Motion to Alter or Amend the Judgment and Request for Attorney's Fees" (the "Opposition") filed by the debtor-defendant Luis Ernesto Flores (the "Debtor").   On June 3, 2015, I conducted a trial on the Plaintiff's complaint seeking to except a debt arising from a loan that the Debtor failed to repay from his discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) or (a)(6).   At the conclusion of the Plaintiff's case and upon the Debtor's motion, I entered judgment for the Debtor on partial findings pursuant to Fed. R. Civ. P. 52(c), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052.   The Plaintiff now seeks reconsideration of that judgment asserting that I applied the

wrong standard under each subsection of 11 U.S.C. § 523(a).  For the reasons set forth below, I will deny the Motion for Reconsideration.

## II. BACKGROUND

A. Procedural History

The Debtor filed a voluntary Chapter 7 petition on October 17, 2013.  On December 23, 2013, the Plaintiff filed the present adversary proceeding seeking to except its debt from the Debtor's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Notably, with respect to the claim under 11 U.S.C. § 523(a)(4), the Plaintiff only pled larceny and not embezzlement or fraud or defalcation while acting in a fiduciary capacity.  The Debtor moved for summary judgement on October 29, 2014, which the Plaintiff opposed on November 13, 2014.  I held a hearing on December 3, 2014, and, after oral arguments, took the matter under advisement.  On February 5, 2015, I entered a Memorandum of Decision and separate order denying the Debtor's motion for summary judgment with respect to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) due to the existence of genuine issues of material fact, but granting the motion with respect to 11 U.S.C. § 523(a)(4), concluding that a consensual loan could not form the basis for larceny.[1]

Prior to the entry of my decision on the motion for summary judgment, the parties filed an Amended Joint Pre-Trial Statement (the "Joint Statement") pursuant to my pre-trial order setting forth admitted facts which require no proof.[2]  I conducted a trial on the remaining counts of the Plaintiff's complaint on June 3, 2015, at which two witnesses—the Debtor and the Plaintiff's president, Gilson Queiroga ("Queiroga")—testified and sixteen exhibits were

---

[1] *Sega Auto Sales, Inc. v. Flores (In re Flores)*, 524 B.R. 420, 430 (Bankr. D. Mass. 2015).

[2] Joint Statement, Docket No. 34 at ¶ II.

introduced into evidence by agreement of the parties.   After the Plaintiff rested his case, the Debtor orally moved for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).   For reasons set forth in section II.C below, I granted the Debtor's oral motion.

On June 16, 2015, the Plaintiff filed the Motion for Reconsideration.   The Debtor filed the Opposition on June 29, 2015.

B. The Facts

The Plaintiff is a Massachusetts corporation in the business of buying and selling used cars in Malden, Massachusetts.[3]   Queiroga has been the Plaintiff's president for seven years.[4] The Debtor is the sole officer and director of A International Collision Center Corporation ("ICC"), which formerly operated on Mystic Avenue in Somerville, Massachusetts.[5]

The basic agreed facts underlying the creation of the loan are as follows.   In 2011, the Debtor and Queiroga met through a mutual acquaintance.[6]   On July 22, 2011, the Plaintiff wrote a check payable to the Debtor in the amount of $15,000.00 (the "Sega Check").[7]   The parties agree that the Sega Check represented a loan to the Debtor, exemplified by Queiroga's memo line notation "boro [sic] for 4 mths."[8]   Contemporaneous with the Plaintiff's tender of the Sega Check, the Debtor wrote a check dated July 22, 2011, payable to the Plaintiff in the amount of $15,000.00 to be drawn from a Bank of America account in the name of ICC (the "First ICC

---

[3] Trans. June 3, 2015 at 10:15-25.

[4] *Id.* at 10:12-14; Joint Statement, Docket No. 34 at ¶ II.1.

[5] Joint Statement, Docket No. 34 at ¶¶ II.3-II.5.

[6] *Id.* at  ¶¶ II. 6.

[7] *Id.* at ¶ II.7.

[8] *Id.* at ¶¶ II.8, 10.

3

Check").[9]  On the memo line of the First ICC Check, the Debtor wrote "Long Waranty [sic]."[10]
It is undisputed that the Bank of America account lacked sufficient funds to negotiate the First
ICC Check at the time it was written and given to Queiroga.[11]  The Debtor accepted and
deposited the Sega Check.[12]

At trial, the witness testimony added surprisingly little elaboration regarding the loan's
genesis.  Consistent with the admitted facts, Queiroga testified that his friend, Eduardo
Betancourt, who was also in the business of selling cars, introduced him to the Debtor.[13]  When
asked when this took place, Queiroga stated that he "believe[d]" it was at "the beginning of the
year" without providing a date for the meeting.[14]  He further explained that he and Eduardo went
to the Debtor's location for the purpose of buying cars from the Debtor.  When asked what was
discussed that day, Queiroga responded:

> We talk about business and we talk about the car.  We went there to propose to
> buy from him and we did.  We buy the car from him.  And we talk about – he talk
> about the – to have – to borrow some money to upgrade his business.[15]

He emphasized that the Debtor "say just apply that (the proposed loan) to the business" without
explaining how the funds would be used.[16]

---

[9] *Id.* at ¶¶ II.12-13, 15.

[10] *Id.* at ¶ II.14.

[11] *Id.* at ¶ II.16.

[12] *Id.* at ¶ II.11.

[13] Trans. June 3, 2015 at 11:1-18.

[14] *Id.* at 11:19-21.

[15] *Id.* at 12:18-23.

[16] *Id.* at 12:24-25; 13:1.

From here, Queiroga's testimony is confusing with respect to the timing of the events in question. The Sega Check is dated July 22, 2011,[17] but at trial, the summary nature of Queiroga's testimony gave the impression that the Plaintiff made the loan on the same day he met the Debtor despite his prior assertion that he "believe[d]" it was at "the beginning of the year."[18] Adding further confusion, he later testified that at the time he made the loan, he knew the Debtor "for a couple of days *or* couple of months."[19]

Notwithstanding the above noted confusion, it is clear that the Sega Check was issued on July 22, 2011.[20] Queiroga testified that the "boro [sic] for 4 mths"[21] notation on the Sega Check was "the agreement we had with him. He's going to return the money to me in four months," and that he discussed that timeframe with the Debtor before giving him the check.[22] Queiroga stated that he believed the Debtor would repay the loan in four months because

> I went to his place. I know him for *a couple of days or couple of months* and he has a very good place, big. Nice. He had a lot of business flowing from there . . . . A lot of cars to repair.[23]

On cross-examination, Queiroga conceded that he never asked the Debtor, and the Debtor never informed him, how much money ICC made.[24] Indeed, Queiroga admitted that the only

---

[17] Joint Statement, Docket No. 34 at ¶ II.7.

[18] Trans. June 3, 2015 at 11:19-21.

[19] *Id.* at 14:14-15 (emphasis added).

[20] Joint Statement, Docket No. 34 at ¶ II.7.

[21] *Id.* at ¶ II.10.

[22] Trans. June 3, 2015 at 14:3-12.

[23] *Id.* at 14:10-22 (emphasis added).

[24] *Id.* at 29:3-14; 30:8-13.

representations the Debtor made to him prior to the tender of the Sega Check were that the Debtor to pay him back, and that the borrowed funds would be applied to ICC.[25]

Queiroga further explained that he and the Debtor exchanged checks and intended the First ICC Check to be a loan warranty.[26]   Queiroga testified that at the time he received the First ICC Check, the Debtor made no representations to him as to whether there were sufficient funds in the Bank of America account to cover the check.[27]   At trial, Plaintiff's counsel stipulated that the natural inference to be drawn from the Debtor's loan request was that he did not have $15,000.00 at that time.[28]   Based solely on their agreement, he believed that he could deposit the First ICC Check in four months.[29]   Nevertheless, at trial, Queiroga admitted that the Debtor requested that Queiroga contact him before attempting to negotiate the check.[30]

In August and September of 2011, the Plaintiff and the Debtor began referring customers to each other for sales and mechanical/body work, respectively.[31]   Each side would then pay the other a commission based on the referral.[32]   The record does not disclose how many referrals took place or how many commissions were paid, but Queiroga testified that each side did, in fact, pay these commissions.[33]

---

[25] *Id.* at 34:21-25; 35:1-15.

[26] *Id.* at 15:4-25; 16:1-10.

[27] *Id.* at 17:3-6.

[28] *Id.* at 28:3-25.

[29] *Id.* at 16:14-19.

[30] *Id.* at 16:22-23; 30:17-21.

[31] *Id.* at 20:25; 21:1-7.

[32] *Id.* at 21:8-13.

[33] *Id.* at 21:14-15.

On August 22, 2011, the Debtor, through ICC, gave the Plaintiff a second check (the "Second ICC Check") in the amount of $1,500.00 drawn from the same Bank of America account as the First ICC Check.[34]  Although the notation on the memo line is difficult to read, the parties agree that it indicates that the Second ICC Check was for loan repayment.[35]   At trial, however, Queiroga testified that the Second ICC Check was not meant to pay principal, but served as "compensation for the money he was borrowing from me" because "he cannot afford to give the 15 at that time . . . ."[36]  He explained that the Debtor agreed to pay him "something" each month as interest, but never specifically stated how much.[37]

Queiroga testified that he received the Second ICC Check from the Debtor at his place of business on August 22, 2011.[38]  When asked how long he waited until he took the Second ICC Check to the bank, Queiroga answered, "December."[39]   Exhibit 3, which includes a "Returned Deposited Item Notice" clearly indicates that the Second ICC Check was deposited on October 24, 2011, and returned for not sufficient funds on October 27, 2011.[40]   In any event, once Queiroga informed the Debtor that the Second ICC Check was returned for not sufficient funds, the Debtor responded that "[n]ext week I will give the money."[41]

---

[34] Joint Statement, Docket No. 34 at ¶¶ II.17-18, 20; Exhibit 3.

[35] *Id.* at ¶ II.19.

[36] Trans. June 3, 2015 at 18:25; 19:1-23.

[37] *Id.* at 31:14-22.

[38] *Id.* at 19:17-23; 20:17-23.

[39] *Id.* at 20:18-23.

[40] Exhibit 3.

[41] Trans. June 3, 2015 at 20:9-17.

Apparently, the return of the Second ICC Check did not sour the budding relationship between Queiroga and the Debtor. To the contrary, Queiroga testified that in November, 2011, the Debtor proposed that he open a second Sega Auto Sales location at ICC's place of business.[42] He further testified that the parties ultimately signed a contract to that effect, but that the plans fell through later that spring due to a permitting issue regarding bathroom facilities on the premises.[43]

Queiroga testified that he took the First ICC Check to Bank of America in December, 2011.[44] It is unclear if he honored the Debtor's request to be contacted beforehand. When Queiroga attempted to cash the First ICC Check, he was informed by the bank that the account was "not good" with no further explanation.[45] Queiroga testified that he then contacted the Debtor by phone and went to see him in person several times, but each time the Debtor simply promised to give Queiroga another check at some future date.[46]

Ultimately, things came to a head in April, 2012. Queiroga testified it was then that the Debtor informed him that he would not be able to complete the bathroom facilities required to obtain the permits to open the Sega Auto Sales location on the ICC premises.[47] He further testified that the Debtor then wrote and handed him three checks drawn from a Citibank account

---

[42] *Id.* at 21:20-25; 22:1-3, 15-20.

[43] *Id.* at 22:4-14.

[44] *Id.* at 17:7-17.

[45] *Id.* at 17:18-24.

[46] *Id.* at 18:5-15.

[47] *Id.* at 22:21-25; 23:1-3. There is some dispute as to whether the Debtor started the necessary construction and how far along it had progressed, but for present purposes it is enough to note that the bathroom facilities were never completed.

in ICC's name.[48]   Each check was in the amount of $8,000.00, for a total of $24,000.00, and

included the memo line notation "pay off long [sic]."[49]   Queiroga explained that the additional

$9,000.00 constituted "compensation" for the loan.[50]   The first check was undated (the "Third

ICC Check"), while the second was  dated April 23, 2012 (the "Fourth ICC Check"), and the

third dated April 30, 2012 (the "Fifth ICC Check").[51]  Queiroga testified that the Debtor told him

that there should be sufficient funds in the account to allow him to negotiate one check a week.[52]

Nevertheless, Queiroga was never able to cash these checks.[53]

Queiroga testified that after the Third ICC Check was returned for not sufficient funds,

the Debtor stopped returning his phone calls and began hiding from him.[54]   Queiroga stated that

he went to the Malden police to "open a claim" for loss by checking, but "they never request my

present [sic] and I never went there."[55]   Ultimately, the Debtor never repaid any amount on

account of the loan.[56]

While Queiroga was impressed by the appearance of cars at the ICC premises, the

evidence at trial establishes neither the Debtor nor ICC were financially stable.   ICC had no

---

[48] *Id.* at 23:1-3, 16-23. *See* Exhibits 4-6; Joint Statement, Docket No. 34 at ¶¶ II.21, 25, 31.

[49] Exhibits 4-6; Joint Statement, Docket No. 34 at ¶¶ II.22-23, 26-27.

[50] Trans. June 3, 2015 at 24:25; 25:1-4.

[51] Exhibits 4-6.

[52] Trans. June 3, 2015 at 23:24-25; 24:1-2.

[53] *Id.* at 24:3-19; Joint Statement, Docket No. 34 at ¶¶ II.29-30.

[54] Trans. June 3, 2015 at 24:20-24.

[55] *Id.* at 25:18-24; 26:1-2.

[56] *Id.* at 26:17-22.

tangible assets, and all the tools and equipment were owned by the Debtor personally.[57]   The

Debtor testified that he had no personal income at the time he solicited the loan, and, in fact, had

no personal income from May, 2011, to May, 2012, nor even a personal bank account.[58]   For the

same period of time, ICC had gross income of $170,000.00, but did not file tax returns for either

year.[59]   ICC employees were paid in cash.[60]   No bank records for the Bank of America account

were produced, but ICC's Citibank account records reflect the following balances between

November 30, 2011, and May 31, 2012:[61]

| Statement Date | Beginning Balance | Ending Balance | Average Balance |
|---|---|---|---|
| 11/30/2011 | $0.00 | $20.00 | $36.00 |
| 12/31/2011 | $20.00 | -$3,098.76 | -$2,645.82 |
| 1/31/2012 | -$3,098.76 | -$522.25 | -$68.55 |
| 2/29/2012 | -$522.25 | $0.00 | -$1,988.60 |
| 3/31/2012 | $0.00 | -$5,638.39 | -$3,649.90 |
| 4/30/2012 | -$5,638.39 | -$757.92 | $736.99 |
| 5/31/2012 | -757.92 | $972.30 | |

Although the Debtor's trial testimony was often rambling and unresponsive, he seemed to

blame the volatility of ICC's account balances on the nature of its business.  The Debtor testified

that when a vehicle was brought to ICC for repairs, ICC purchased the requisite parts from

various suppliers in cash prior to receiving any payment from its customer or any insurance

company.[62]   If an insurance company was involved, the Debtor indicated the process for payment

---

[57] *Id.* at 53:20-22; 55-58; 82:2-12.

[58] *Id.* at 45:4-12.

[59] *Id.* at 53:5-19; 77:4-9.

[60] *Id.* at 68-71.

[61] Exhibit 13.

[62] Trans. June 3, 2015 at 86:9-21; 87:6-25.

was slower due to having to obtain the necessary approvals in advance.[63]  The Debtor further insisted that despite the negative balances reflected on each bank statement, the statements would not have reflected any yet unposted insurance checks to which ICC was entitled.[64]

At trial, the Debtor testified that the purpose of the loan from the Plaintiff was not to grow the business, but to pay for the parts necessary to begin the repairs on a vehicle.[65]  He asserted that in once instance ICC later spent approximately $22,000.00 on parts for a vehicle and, after completing the repairs, released the vehicle to the customer upon receiving authorization from the insurance company.[66]  The insurance company, however, never paid him the $32,000.00 owed for the work.[67]  The Debtor testified that he intended to repay the Plaintiff from the money he expected to receive from the insurance company.[68]  At trial, the Debtor was unable to point to the debits in the bank records evidencing the purchase of $22,000.00 worth of parts.[69]

Ironically, ICC's body shop itself, which had so impressed Queiroga, was another source of financial strain.  The Debtor testified that ICC's commercial lease agreement with W.F. Lacey & Sons Company (the "Landlord") required rent of $20,000.00 per month, plus "triple net" fees in the approximate amount of $16,000.00 to $17,000.00 per month.[70]  The parties stipulated that

---

[63] *Id.* at 86:9-21.

[64] *Id.* at 67:7-25.

[65] *Id.* at 86:3-21.

[66] *Id.* at 92:2-9; 94-97.

[67] *Id.* at 92:2-9.

[68] *Id.* at 87:1-5.

[69] *Id.* at 94-97.

[70] *Id.* at 89:10-17.

"during the period in which he gave the Plaintiff the ICC Checks cited above, the [Debtor] failed to pay commercial rent owed to [the Landlord]."[71]   After the Debtor delivered three checks to the Landlord that were returned for insufficient funds between June and August of 2012, the Landlord applied for a criminal complaint against the Debtor alleging larceny by check.[72]   In September, 2012, ICC was evicted from the premises.[73]

During the same time period, the Debtor defaulted on a promissory note owed to CAP Financial Services, Inc.[74]   As further explanation for these financial difficulties, the Debtor testified that he was injured in an accident in May, 2012 and was unable to work for an unspecified amount of time.[75]

C. Bench Ruling

Upon the Debtor's oral motion for judgment on partial findings, I summarily dispensed with the Plaintiff's claim for nondischargeability under 11 U.S.C. § 523(a)(6), noting that even if I were to assume willfulness, the Plaintiff failed to introduce any evidence that would satisfy the requirement of malice.[76]   Then, turning to the Plaintiff's principle charge under 11 U.S.C. § 523(a)(2)(A), I concluded that if I were to assume the Debtor made a false representation and intended to deceive the Plaintiff, the Plaintiff's case would still fail under standards set forth by the United States Court of Appeals for the First Circuit because there was no reliance. Specifically, I ruled:

---

[71] Joint Statement, Docket No. 34 at ¶ II. 35.

[72] Exhibit 14.

[73] Trans. June 3, 2015 at 71:21-25; 72-74:1-3.

[74] Joint Statement, Docket No. 34 at ¶ II. 34.

[75] Trans. June 3, 2015 at 82:19-25; 83:1-4.

[76] *Id.* at 111:1-17.

12

[W]hen I get down to the fourth element the creditor actually relied upon the misrepresentation, this is where I think the plaintiff fails. What did the plaintiff think about before he made the $15,000 loan? He looked at the debtor's business and he says it looked busy and that's all he did. That's all he did. And with that, only that amount of due diligence he went ahead and made the loan.

Now, this isn't a case like . . . where the Circuit held that the lender didn't have to do much due diligence because it had a history with the borrower. Well, here there was no history with the borrower. This guy was newly introduced. I don't find any reliance at all. Certainly not justifiable reliance which is what the Supreme Court requires if you're going to make a debt non-dischargeable under 523(a)(2)(A).[77]

Accordingly, I granted the Debtor's motion on the basis that the Plaintiff failed to demonstrate a requisite element of each theory under which he proceeded.[78]

## III. POSITIONS OF THE PARTIES

### A. The Plaintiff

The Plaintiff argues that my interpretation of justifiable reliance is at odds with precedent from both the Supreme Court of the United States and the First Circuit.  Citing *Field v. Mans*,[79] the Plaintiff asserts that the justifiable reliance standard does not require a creditor to investigate the veracity of a statement that is not materially false.  The Plaintiff contends that a duty to investigate only exists when there is an extreme, obvious false representation that even a perfunctory examination would reveal.  Thus, in the absence of any obvious red flags, the Plaintiff maintains that the justifiable reliance standard protects it as a victim of an intentional tort even if the loan proves to have been negligent.

Comparing Queiroga's actions to other cases, the Plaintiff concludes that the level of reliance displayed falls well within the range of justifiable conduct.  For example, the Plaintiff

---

[77] *Id.* at 112:12-25; 113:1-3.

[78] *Id.* at 113:4-7.

[79] *Field v. Mans*, 516 U.S. 59 (1995).

notes that if a bank, such as the one in *In re Levasseur*,[80] can justifiably rely on inaccuracies in its own records before extending credit, then the Plaintiff's reliance on the observation of an apparently successful business must also be justifiable.   Similarly, like the plaintiffs in *In re Ragonese*,[81] the Plaintiff was "fast developing a business relationship with the [Debtor]," but did not go as far as they did by indulging multiple requests for money in the face of mounting evidence that it was ill spent.[82]

With respect to the remaining elements under 11 U.S.C. § 523(a)(2)(A), at trial, the Plaintiff argued that the Debtor had absolutely no basis to think that he could repay the loan within four months based on his lack of income or bank account, the unprofitability of ICC, and the persistent negative balances in ICC's account.   The Plaintiff further concluded that the Debtor intended to deceive based on the lack of any basis to believe he would have $15,000.00 to repay the loan four months later.   Finally, the Plaintiff asserts that it has been damaged by the Debtor's false statement that he would repay the loan in the face amount of the loan.

Turning to 11 U.S.C. § 523(a)(6), the Plaintiff argues that the Debtor intentionally solicited a loan that he could not have reasonably believed he could repay.   In so doing, the Plaintiff posits, the Debtor knew or should have known that there was a substantial certainty that the Plaintiff would suffer a harm due to the Debtor's inability to repay the loan.   Indeed, the Plaintiff asserts that the Debtor would not "have kept passing those checks if he didn't know that the plaintiff was going to suffer damage."[83]   Because the Debtor gave the Plaintiff five bad checks, the Plaintiff concludes that he intended cause harm.

---

[80] *Levasseur v. Old Republic Nat'l Title Ins. Co. (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013).

[81] *Falcone v. Ragonese (In re Ragonese)*, 505 B.R. 605 (B.A.P. 1st Cir. 2014).

[82] Motion for Reconsideration, Docket No. 68 at 11-12.

[83] Trans. June 3, 2015 at 107:9-11.

The Plaintiff maintains that the evidence at trial establishes that the Debtor had no just cause or excuse.  In particular, the Plaintiff points to the fact that the Debtor was subject to numerous lawsuits and criminal charges, paid his employees in cash, did not keep adequate business records, maintained negative account balances, and repeatedly defaulted on his obligations.  In the Motion for Reconsideration, the Plaintiff likens the situation to that in *In re Ruhland*,[84] where an employer repeatedly told his employees he would pay them soon, but kept no business records and could not explain why he failed to pay them.

In sum, the Plaintiff requests that I vacate the judgment entered on June 3, 2015, and, pursuant to Fed. R. Civ. P. 59(b), schedule the matter for a new trial.  Alternatively, the Plaintiff asks that I resume the trial to take additional testimony and enter a new judgment.

### B. The Debtor

As an initial matter, the Debtor objects to the Plaintiff being allowed to present any further evidence in this case, noting that the Plaintiff already presented its case.

The Debtor argues that the Plaintiff failed to demonstrate any element of 11 U.S.C. § 523(a)(2)(A).  He emphasizes that by the Plaintiff's own admission, the only representation he made was that he would repay the loan within four months.  The Debtor urges that his subsequent failure to do so is not evidence that the promise was false.  To the contrary, the Debtor testified at trial that he intended to repay the loan with funds he expected to receive from an insurance company.

With respect to reliance, the Debtor asserts that the Plaintiff misunderstands my bench ruling, and that the issue is not whether the Plaintiff's reliance was justifiable, but whether there was any reliance at all.  He points to the fact that he and Queiroga did not know each other well

---

[84] *Chaves v. Ruhland (In re Ruhland)*, No. 11-19510-JNF, 2013 WL 1088737 (Bankr. D. Mass. Mar. 13, 2013).

before the loan.  Moreover, the Debtor contends that Queiroga's testimony establishes that he relied not on the Debtor's representations, as he admits the Debtor did not make any, but on his own assumptions drawn from his observations.    The Debtor likens the situation to the assumption that a person wearing an expensive suit can repay a loan based solely on his appearance.

The Debtor further argues that the Plaintiff has not demonstrated malice under 11 U.S.C. § 523(a)(6).  He contends that by focusing on the passing of five bad checks, the Plaintiff has only demonstrated that the Debtor is a bad businessman.

For these reasons, the Debtor asks that the Motion for Reconsideration be denied.  He also requests his reasonable attorney's fees incurred in the defense of the motion.

## IV. **DISCUSSION**

From the outset, I note that the Plaintiff's primary request for relief—that I vacate my June 3, 2015 judgment in favor of the Debtor and schedule the matter for a *new trial* pursuant to Fed. R. Civ. P. 59(a)(1)(B)—is denied.[85]  The Plaintiff had the opportunity to present evidence, did so, and rested.[86]  Given the procedural posture, there is absolutely no reason why the Plaintiff should now, with the benefit of hindsight, be afforded an additional opportunity at this stage to present evidence.    Indeed, the Plaintiff does not even offer one in the Motion for Reconsideration.  If, as the Plaintiff suggests, I applied the wrong legal standards in my bench

---

[85] Fed. R. Civ. P. 59(a)(1)(B), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.

[86] Trans. June 3, 2015 at 99:13-14.

ruling, the error did not prejudice the Plaintiff's case.[87]   Thus, vacatur of the judgment is only

appropriate if the Plaintiff proves each and every element of its claim on the record as it stands.[88]

A. The Rule 59(e) Standard

The standard for reconsideration is well established in this district.   Under Fed. R. Civ. P.

59(e),   I may reconsider a judgment upon the filing of a motion by a party within fourteen days

of the entry of the judgment.[89]   To be clear, "[r]ule 59(e) motions are aimed at reconsideration,

not initial consideration."[90]   "It is not a vehicle for rehashing arguments previously made or for

refuting the court's prior ruling."[91]   Nor is it a substitute for an appeal.[92]   Instead, "[t]o succeed

on a motion to reconsider, the Court requires that the moving party show newly discovered

evidence or a manifest error of fact or law."[93]   To be clear, the moving party cannot use Fed. R.

Civ. P. 59(e) to cure procedural defects, offer new evidence, or raise arguments that could and

should have been presented originally to the court.[94]

B. Nondischargeability under Section 523

---

[87] To constitute proper grounds for granting a new trial, an error, defect or other act must affect the substantial rights of the parties. *See Walker v. Bain*, 257 F.3d 660 (6th Cir. 2001).

[88] Assuming the Plaintiff was able to do so, which I conclude it has not, trial would then resume to enable the Debtor to present his defense.

[89] *See* Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.

[90] *Harley-Davidson Motor Co., Inc. v. Bank of New England-Old Colony, N.A.*, 897 F.3d 611, 616 (1st Cir. 1990) (*citing White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 451 (1982)).

[91] *In re Mortgage Investors Corp.*, 136 B.R. 592, 597 (Bankr. D. Mass. 1992) (*quoting In re Grand Builders, Inc.*, 122 B.R. 673, 675 (Bankr. W.D. Pa.1990) (citations omitted)).

[92] *In re Oak Brook Apartments*, 126 B.R. 535, 536 (Bankr. S.D. Ohio 1991).

[93] *In re Wedgestone Fin.*, 142 B.R. 7, 8 (Bankr. D. Mass. 1992) (citations omitted).   *See also Landrau–Romero v. Banco Popular De P.R.*, 212 F.3d 607, 612 (1st Cir. 2000).

[94] *Schwartz v. Schwartz (In re Schwartz)*, 409 B.R. 240, 250 (B.A.P. 1st Cir. 2008) (*citing Lopez Jimenez v. Pabon Rodriguez (In re Pabon Rodriguez )*, 233 B.R. 212, 219 (Bankr. D.P.R. 1999), *aff'd*, 17 Fed.Appx. 5 (1st Cir. 2001)).

In accordance with the Bankruptcy Code's "fresh start" policy, "[e]xceptions to discharge are narrowly construed.[95]   Thus, to prevail in an adversary proceeding brought under 11 U.S.C. § 523(a), the Plaintiff must prove each and every element of an exception to discharge by a preponderance of the evidence.[96]   Indeed, "the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'"[97]

### 1. Nondischargeability under Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt, "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- false pretenses, a false representation, or actual fraud . . . ."[98]   In order to establish that a debt was obtained by false pretenses, false representation, or actual fraud, the creditor must show that:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;
>
> (2) the debtor intended to deceive;
>
> (3) the debtor intended to induce the creditor to rely upon the false statement;
>
> (4) the creditor actually relied upon the misrepresentation;
>
> (5) the creditor's reliance was justifiable; and
>
> (6) the reliance upon the false statement caused damage.[99]

---

[95] *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

[96] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[97] *Palmacci v. Umpierrez*, 121 F.3d at 786 (*quoting Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994), *overruled on other grounds by Field v. Mans*, 516 U.S. 59, 70–71 (1995)).

[98] 11 U.S.C. § 523(a)(2)(A).

[99] *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (footnote omitted) (*citing Palmacci v. Umpierrez,* 121 F.3d at 786).

The first two elements of the test describe the conduct and scienter required to show fraudulent conduct, while the last four elements embody the requirement the creditor's claim must arise directly from the debtor's fraud.[100]

At trial, I ruled that even if I were to assume the existence of the first three elements, the Plaintiff did not establish the fourth—actual reliance.  In light of the current procedural posture and the opportunity to consider the evidence more thoroughly, I will now discard this assumption and make findings with respect to these threshold elements.

Under the first element, a false representation can include a statement of future intention, such as a promise to act, but a promise to act is only a false representation if at the time the debtor made the promise he had no intention of performing.[101]  The second element, however, refers to a different type of intent—the debtor's intent to deceive, manipulate, or defraud.[102]  Indeed, "[f]raudulent intent requires . . . more than mere negligence," and "[a] 'dumb but honest' defendant does not satisfy the test of scienter."[103]  Thus, "[a]n honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit."[104]  Nevertheless, the unreasonableness of the speaker's belief may be strong evidence that it does not in fact exist.[105]  As the First Circuit explained in *Palmacci v. Umpierrez*:

---

[100] *Id.*

[101] *Palmacci v. Umpierrez*, 121 F.3d at 786-787.

[102] *Id.*

[103] *Id.* at 788.

[104] *Id.* at 788.

[105] *Id.*

> The finder of fact may 'infer[ ] or imply[ ] bad faith and intent to defraud based on the totality of the circumstances when convinced by a preponderance of the evidence.' Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance.[106]

Although the inquiries are distinct, in many cases the same factors show both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive.[107]

In the present case, I find that the question of both the Debtor's knowledge and intent to be a close call, but ultimately tips in the Plaintiff's favor. The evidence establishes that at the time the Debtor solicited the loan, both his personal financial condition and that of ICC were precarious. The Debtor had no income and no bank account, and he was in default on a promissory note owed to CAP Financial Services, Inc. There was certainly no reason for him to believe that he, personally, could have repaid the loan.

The evidence with respect to ICC is less striking, but still weighs in the Plaintiff's favor. It is undisputed that ICC did not have $15,000.00 on July 22, 2011. While the record does not contain bank records from the time of the loan, the Debtor's testimony was that ICC was not profitable and ICC's practice of advancing the cost of parts needed to complete repairs often caused it to operate with negative account balances. Indeed, the Debtor testified that the purpose of the loan was to advance the funds necessary to complete a repair prior to receiving reimbursement from an insurance company. The parties have also stipulated that "during the

---

[106] *Id.* at 789 (internal citations omitted).

[107] *Bellas Pavers, LLC v. Stewart (In re Stewart)*, MB 12-017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. Oct. 18, 2012) (*citing Boyuka v. White (In re White)*, 128 Fed. Appx. 994, 998 (4th Cir. 2005)).

period in which he gave the Plaintiff the ICC Checks cited above, the [Debtor] failed to pay commercial rent owed to [the Landlord]."[108]

Admittedly, funds were flowing into ICC's accounts, and the Debtor credibly testified that he anticipated receiving a large payment from an insurance company with respect to a vehicle that he had already released to the customer. The Debtor's testimony, however, is unclear regarding whether he anticipated receiving that payment before soliciting the loan, or whether he later came to view this as a potential source from which to pay the outstanding obligation. Either way, an objective view of the record amply supports the conclusion that given the volatility of ICC's accounts and its outstanding indebtedness, the ability to repay the Plaintiff was, at best, a long shot.

The standard under 11 U.S.C. § 523(a)(2)(A) is nonetheless a subjective one, and it is insufficient to simply point to how a reasonable person would have acted.[109] Still, fraud may be inferred as a matter of fact from the totality of the circumstances.[110] An honest belief that a representation is true defeats a finding of deceit only where "the speaker has information to justify it."[111] Given ICC's financial status, I find that the Debtor did not have a justifiable basis to believe he could repay the loan in four months, and that such a representation was made with a reckless disregard for the truth. Similarly, I infer from the implausibility of both the Debtor's and ICC's ability to repay the loan in four months that the Debtor did not have such an intention.

I stress, however, that the inference of deceit is limited to the Debtor's representation that he would repay the loan *within four months*. Full repayment of the loan in that time period was

---

[108] Joint Statement, Docket No. 34 at ¶ II. 35.

[109] *Palmacci v. Umpierrez*, 121 F.3d at 788.

[110] *Id.* at 789.

[111] *Id.* at 788.

21

implausible, and the Debtor could not justify such a representation based on the facts known to him at the time. Nevertheless, the parties testified that the Debtor paid the Plaintiff commissions for referring customers to ICC, and attempted to partner with the Plaintiff to open a second sales location on the Debtor's business premises. If the Debtor truly intended to *never* repay the Plaintiff, it seems unlikely that he would have sought to expand their business relationship. This is, perhaps, a distinction without a difference under 11 U.S.C. § 523(a)(2), but is important to my findings below within respect to 11 U.S.C. § 523(a)(6).

As to the third element, there is no dispute that the Debtor intended to induce the creditor to rely upon his promise to repay the loan within four months.

The fourth and fifth elements are related and require the creditor to actually and justifiably rely upon the debtor's misrepresentation.[112] In *Field v. Mans*, the Supreme Court of the United States held that justifiable reliance under 11 U.S.C. § 523(a)(2)(A) is a lower standard than reasonableness.[113] Thus, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"[114] In determining whether a plaintiff's reliance was justifiable, the court looks to "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case."[115] Nevertheless, a person "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[116]

---

[112] *In re Spigel*, 260 F.3d at 32.

[113] *Field v. Mans*, 516 U.S. at 70.

[114] *Id.* (*quoting* Restatement (Second) of Torts § 540).

[115] *Id.* at 71 (*quoting* Restatement (Second) of Torts § 545A, Comment *b*).

[116] *Id.* (*quoting* Restatement (Second) of Torts, § 541, Comment *a*).

Because I referenced a lack of due diligence on Queiroga's part in my bench ruling, the Plaintiff contends that I applied the wrong standard—that of reasonable reliance—when assessing the fifth element. The Plaintiff misconstrues my ruling, however, because I expressly found no reliance at all.[117] For the following reasons, I stand by that finding.

Queiroga stated that he believed the Debtor would repay the loan in four months because

> I went to his place. I know him for *a couple of days or couple of months* and he has a very good place, big. Nice. He had a lot of business flowing from there . . . . A lot of cars to repair.[118]

As I indicated above, the first problem with Queiroga's testimony is that it is bafflingly uncertain as to how long he knew the Debtor before extending the loan—either "for a couple of days *or* couple of months."[119] Meanwhile, his explanation of the genesis of the loan gave the impression that it was made on the same day he met the Debtor. For these reasons, I find that Queiroga had just met the Debtor, either that day or shortly before, and did not know him at all at the time the Plaintiff made the loan.

Next, Queiroga's testimony is notable in that he admitted that the Debtor only made two representations to him—that the Debtor would pay him back in four months, and that the borrowed funds would be applied to ICC.[120] The Plaintiff did not challenge the Debtor's use of the loan at trial, and there is no evidence to suggest it was not used for ICC's operations. Queiroga never asked the Debtor, and the Debtor never volunteered, how much money ICC made.[121] Instead, Queiroga simply looked at ICC's body shop--"a very good place, big. Nice.

---

[117] Trans. June 3, 2015 at 112:12-25; 113:1-3.

[118] *Id.* at 14:10-22 (emphasis added).

[119] *Id.* at 14:14-15 (emphasis added).

[120] *Id.* at 34:21-25; 35:1-15.

[121] *Id.* at 29:3-14; 30:8-13.

He had a lot of business flowing from there . . . .   A lot of cars to repair."[122]—before loaning $15,000.00, an amount his counsel characterized in his opening as a lot of money for both parties.[123]   Moreover, the Plaintiff stipulated that the natural inference to be drawn from the circumstances was that the Debtor did not have funds to cover the First ICC Check on the date Queiroga received the First ICC Check, rendering the "loan warranty" illusory and not a basis for any reliance.

It is, perhaps, counterintuitive to say that a party who loans $15,000.00 to another does not rely on the promise of repayment, but even having taken the opportunity to further review the evidence, I reach the same conclusion.   Queiroga, who was the president of his own business, loaned a large amount of money to a person he did not know for a business he knew nothing about beyond that there appeared to be "[a] lot of cars" on the business premises at the time he extended the loan.[124]   The Plaintiff complains that there were no "red flags" to alert Queiroga to the falsity of the Debtor's representations, but he ignored the biggest red flag of all—complete ignorance.   Particularly in the absence of any other representation, Queiroga simply did not have enough information to rely on the Debtor's naked promise of repayment.

The example cited by the Debtor is similar to one that I considered prior to my bench ruling.   Consider the following: One day, B walks up to A and asks borrow $500.00.   A has never met B before, but B is wearing a bespoke suit and gold watch, and states that he is an investment banker.   Based on B's appearance and occupation, A believes B must have the money

---

[122] *Id.* at 14:10-22 (emphasis added).

[123] *Id.* at 5:9-12.

[124] *Id.* at 14:10-22.

to pay him back.  If A loans B the money, is he relying on B's promise to repay, or on his own assumptions about B?

That is essentially the question posed by this adversary proceeding.  Ultimately, it appears Queiroga relied not on the Debtor's promise, but his own unfounded assumptions drawn from on a single, cursory observation: that the body shop looked nice and busy.  Ironically, the volume of automobiles serviced caused the cashflow problems which plagued ICC, which is why the Debtor needed the loan in the first place.  Similarly, the "nice shop" was rented by ICC pursuant to an expensive commercial lease ICC could not pay.  Given "the qualities and characteristics" of the Plaintiff, and under "the circumstances of the particular case," I find that there was no reliance on the Debtor's representations.[125]  Thus, judgment must enter in favor of the Debtor.

### 2. Nondischargeability under Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity…."[126]  In *Kawaauhau v. Geiger*,  the United States Supreme Court explained that the word "willful," as used in 11 U.S.C. § 523(a)(6), "modifies the word 'injury,'" indicating that nondischargeability under that section therefore requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[127]  In other words, the defendant must intend the *consequences of an act*, not simply the

---

[125] *Field v. Mans*, 516 U.S. at 71 (*quoting* Restatement (Second) of Torts § 545A, Comment *b*).

[126] 11 U.S.C. § 523(a)(6).

[127] *Kawaauhau v. Geiger*, 523 U.S. at 61-62.

act itself.  "Thus, recklessly or negligently inflicted injuries are not excepted from discharge under [11 U.S.C.] § 523(a)(6)."[128]

The Supreme Court's citation to the Restatement (Second) of Torts[129] has prompted courts to conclude that the willfulness element also includes actions intentionally done and known by the debtor to be "substantially certain to cause injury,"[130] but application of this concept has proved challenging.[131]  Applied too broadly, "a purely objective substantial certainty analysis would bring the court dangerously close to the recklessness standard decried in *Kawaauhau* [*v. Gieger*]."[132]  The standard, if applied at all, must be subjective and rooted in what the debtor actually knew.  Thus, the analysis under 11 U.S.C. § 523(a)(6) contrasts the inquiry under 11 U.S.C. § 523(a)(2).  Indeed, though I may infer deceit under 11 U.S.C. § 523(a)(2) where the Debtor had actual knowledge of facts that rendered his representation unjustifiable, 11 U.S.C. § 523(a)(6) requires that I nonetheless consider the Debtor's subjective intent, even if his beliefs were wholly unreasonable.

---

[128] *Trenwick Am. Reinsurance Corp. v. Swasey (In re Swasey)*, 488 B.R. 22, 34 (Bankr. D. Mass. 2013) (citing *Kawaauhau v. Geiger*, 523 U.S. at 64).

[129] Restatement (Second) of Torts § 8A ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").

[130] *In re Bradley*, 466 B.R. at 587; *Hermosilla v. Hermosilla (In re Hermosilla)*, 430 B.R. 13, 22 (Bankr. D. Mass. 2010); *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 18–19 (Bankr. D. Me. 1998).

[131] *See Stewart Tilghman Fox & Bianchi, P.A. v. Kane (In re Kane)*, 470 B.R. 902, 941 (Bankr. S.D. Fla. 2012).  In *In re Kane*, the bankruptcy court observed:

> There is some disagreement among the courts as to whether the substantial certainty standard is a subjective standard, requiring the plaintiff to prove that the defendant knew the act was substantially certain to cause injury, or an objective standard, requiring the plaintiff to show that the defendant's act was substantially certain to cause injury without regard to the defendant's actual belief or knowledge in this regard.

*Id.*

[132] *Id.* at 942.

*Geiger* did not address the element of malice required under 11 U.S.C. § 523(a)(6).  As such, courts within this circuit have concluded that *Geiger* did not upset the United States Court of Appeals for the First Circuit's prior determination in *Printy v. Dean Witter Reynolds, Inc.*[133] that 11 U.S.C. § 523(a)(6)'s element of malice requires that the creditor show the injury was caused "without just cause or excuse."[134]  Therefore, construing *Geiger* and *Printy* together, for a debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6), the creditor must show that: (1) the creditor suffered an injury; (2) the injury was the result the debtor's actions; (3) the debtor intended to cause the injury or that there was a substantial certainty that the injury would occur; and (4) the debtor had no just cause or excuse for the action resulting in injury.[135]

In the present case, the Plaintiff has not established the requisite elements under 11 U.S.C. § 523(a)(6).  As discussed above, the record amply supports the conclusion that the Debtor recklessly promised repayment when he could not reasonably have had any confidence of his or ICC's ability to actually perform, but I do not find that the Debtor borrowed the funds intending to cause injury to the Plaintiff.  The Debtor was a poor businessman, but the evidence does not establish that that the Debtor subjectively knew that his actions were substantially certain to cause injury to the Plaintiff.  To the contrary, the Debtor's testimony reflects that he believed, perhaps unrealistically, that he could turn his financial difficulties around.[136]

---

[133] *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997).

[134] *See, e.g., Jones v. Svreck (In re Jones)*, 300 B.R. 133, 140 (B.A.P. 1st Cir. 2003); *In re Colokathis*, 417 B.R. at 158; *Greene v. Mullarkey (In re Mullarkey)*, 410 B.R. 338, 355 (Bankr. D. Mass. 2009); *Casella Waste Mgmt. v. Romano (In re Romano)*, 385 B.R. 12, 31 (Bankr. D. Mass. 2008); *Burke v. Neronha (In re Neronha)*, 344 B.R. 229, 231 (Bankr. D. Mass. 2006); *Caci v. Brink (In re Brink)*, 333 B.R. 560, 567 (Bankr. D. Mass. 2005); *Gomes v. Limieux (In re Limieux)*, 306 B.R. 433, 440 (Bankr. D. Mass. 2004); *McDonough v. Smith (In re Smith)*, 270 B.R. 544, 549 (Bankr. D. Mass. 2001); *In re Slosberg*, 225 B.R. at 21.

[135] *See In re Colokathis*, 417 B.R. at 158.

[136] I previously stressed that I infer from the circumstances that the Debtor did not intend to repay the Plaintiff in four months, but that the record does not mandate the conclusion that the Debtor never intended to repay the loan.

I am also unpersuaded that the series of bad checks given to the Plaintiff evidence a willful and malicious injury. At the time Queiroga received the First ICC Check, he knew that the Debtor almost certainly lacked funds to cover it. Going forward, the record suggests that in light of the speed with which funds were moving in and out of ICC's bank accounts, the Debtor wrote checks without ever knowing how much money was in the accounts at any given time, but simply hoped that everything would work out on the later date the check was negotiated. Indeed, the parties' unrebutted testimony is that the Debtor wrote checks based not on the current account balance, but instead based upon amounts he anticipated ICC would receive from his own customers by the date of presentment. Not surprisingly, this resulted in cash shortfalls when the payments were not received. Again, these were undoubtedly poor business practices, but hardly rise to the level of willful and malicious.

Even if I were to assume willfulness, as I did at trial, the Plaintiff has not proven that the Debtor's failure to repay was without just cause or excuse. The evidence at trial indicates that the Debtor did not repay the Plaintiff simply because he did not have the money to do so. A bare inability to perform is a just excuse for nonperformance.

The Plaintiff's reliance on *In re Ruhland* is misplaced. In that case, the debtor owned a painting business and employed undocumented immigrants, such as the creditor, for seasonal labor.[137] During the year that the creditor was employed by the debtor, the debtor repeatedly issued the creditor bad checks and failed to pay him.[138] Ultimately, the Massachusetts Attorney General issued a citation finding that the debtor intentionally violated the Massachusetts wage

---

[137] *In re Ruhland*, 2013 WL 1088737, at *1.

[138] *Id.* at *4.

and hour laws.[139]   The bankruptcy court, holding that the debt was nondischargeable under 11

U.S.C. § 523(a)(6), found that the debtor repeatedly induced the creditor to perform labor for

substantially less than the value of those services in willful and knowing violation of

Massachusetts law and with knowledge of the injury that it was certain to cause the creditor.[140]

In dismissing the debtor's claim of just cause or excuse, the court found that the debtor took

advantage of the creditor's lack of education and undocumented status, and intentionally sought

to avoid compliance with Massachusetts wage laws as evidence by his failure to pay or maintain

records for his employees.[141]

The scenario posed by *In re Ruhland* is egregious and distinguishable from the case at

bar.  While the Debtor may ultimately have faced criminal charges for larceny by check, though

not pursued by the Plaintiff, the circumstances under which the Debtor wrote those checks are

inapposite.  Here, the Debtor was simply a poor businessman running an unprofitable company,

while *Ruhland* preyed on undocumented and unsophisticated workers to obtain cheap (or free)

labor.  The debt in *Ruhland* arose from an order to pay restitution for failure to comply with the

Massachusetts wage laws, while the debt here is simply on account of an unpaid business loan.

The Debtor issuing bad checks long after the loan was made does not elevate the debt beyond its

meager foundations.

Accordingly, I find that the Debtor is entitled to judgment as a matter of law under

11 U.S.C. § 523(a)(6).

---

[139] *Id.  See* Mass. Gen. Laws ch. 149, § 148; Mass. Gen. Laws ch. 151, §§ 1A and 1B.

[140] *In re Ruhland*, 2013 WL 1088737, at *9.

[141] *Id.* at 12.

C. Attorney's Fees

In the opposition, the Debtor requests his reasonable attorney's fees for defending against the Motion for Reconsideration.  The "basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."[142]  Here, there is no relevant statute or contract.   A court may, however, award attorney's fees when the non-prevailing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[143] Vexatious conduct requires that "the losing party's actions were 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"[144]  A weak or legally inadequate case is insufficient to trigger the bad faith exception to the "American Rule,"[145] as the exception must be "used sparingly and reserved for egregious circumstances."[146]

Here, I conclude that the Motion for Reconsideration was without merit, but it was not frivolous or filed in bad faith.  The issue of reliance is in this case was complicated, and in light of my reference to Queiroga's diligence, the Plaintiff was not unreasonable in seeking reconsideration of my considerably shorter, less detailed bench ruling.  For this reason, the Debtor has not demonstrated that he is entitled to his attorney's fees.

---

[142] *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) (*quoting Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253 (2010)) (internal quotation marks omitted). *See Mullane v. Chambers*, 333 F.3d 322, 337 (1st Cir. 2003).

[143] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991).

[144] *Local 285, Serv. Employee Int'l Union, AFL-CIO  v. Nonotuck Resource Assocs., Inc.*, 64 F.3d 735, 737 (1st Cir. 1995) (*quoting Washington Hosp. Ctr. v. Serv. Employees Int'l Union Local 722, AFL-CIO*, 746 F.2d 1503, 1510 (D.C. Cir. 1984)).

[145] *Americana Indus., Inc. v. Wometco de Puerto, Inc.*, 556 F.2d 625 (1st Cir. 1977).

[146] *Mullane*, 333 F.3d at 338.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order denying the Motion for Reconsideration and the Debtor's request for attorney's fees.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: August 13, 2015


Counsel Appearing:

     Peter Cole, Law Office of Peter Cole, Allston, MA
        for the Plaintiff
     Robert V. Whynott, Gloucester, MA
        for the Debtor